IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| SUSAN PRYOR, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> JO ANNE B. BARNHART, Commissioner of Social ) <br> Security, ) <br> ) <br> Defendant. ) | CV 05-875-PK <br><br> FINDINGS AND <br> RECOMMENDATION |

PAPAK, Magistrate Judge:

## INTRODUCTION

Plaintiff Susan Pryor brings this action for judicial review of a final decision of the Commissioner of Social Security denying her application for disability insurance benefits (DIB) and supplemental security income payments (SSI) under Titles II and XVI of the Social Security Act. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383©(3). The Commissioner concedes

1 - FINDINGS AND RECOMMENDATION

that her decision contains errors and moves the court to remand for further proceedings (docket # 21). Pryor opposes additional proceedings and seeks an immediate award of benefits. The Commissioner's motion to remand for further proceedings should be denied. The Commissioner's final decision should be reversed and remanded for an award of benefits.

## BACKGROUND

Pryor was born September 4, 1953. Tr. 234.[1] She graduated from high school and attended nursing school for two years. Tr. 250. Pryor was employed as a computer wafer processor. On December 12, 1999 she was in an automobile accident as she was leaving work. Tr. 59-60, 246. Pryor alleges disability from this date due to a cognitive disorder from a head injury, lumbar spine degenerative disc disease, chronic pain syndrome, headaches, obesity, depression, and a personality disorder.

Pryor applied for DIB on October, 1, 2001 and SSI on September 23, 2002. Her claim was denied and she requested a hearing. A hearing and supplemental hearings were held before an Administrative Law Judge (ALJ) on March 5, 2003, July 21, 2003, January 15, 2004 and March 25, 2004. Pryor satisfied the insured status requirements for a claim under Title II through September 30, 2001, and must establish that she was disabled on or before that date to prevail on her DIB claim. 42 U.S.C. § 423(a)(1)(A). *See Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998). The ALJ issued an opinion on May 12, 2004 and found Pryor was not disabled, which is the final decision of the Commissioner.

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner has established a sequential process of up to five steps for determining whether a person over the age of 18 is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by her impairments. 20 C.F.R. §§ 404.1545, 416.945; Social Security Ruling (SSR) 96-8p. Pryor challenges the ALJ's determination of her RFC. At step four, the Commissioner must determine whether the claimant retains the RFC to perform work she has done in the past. If the ALJ determines that she retains the ability to perform her past work, the Commissioner will find the claimant not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). The ALJ found Pryor was not able to perform her past work.

At step five, the Commissioner must determine whether the claimant retains the RFC to perform work that exists in the national economy. *Bowen v. Yuckert*, 482 U.S. at 142; 20 C.F.R. §§ 404.1520(e), (g), 416.920(e), (g). Here the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Tackett v. Apfel*,

3 - FINDINGS AND RECOMMENDATION

180 F.3d 1094, 1099 (9th Cir. 1999). If the Commissioner meets this burden, then the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966. The ALJ found that Pryor could make a successful vocational adjustment to other work in the regional and national economy. Pryor asserts the Commissioner failed to meet her burden at this step. The Commissioner concedes the ALJ erred at step five and seeks a remand to correct the error.

## THE ALJ's FINDINGS

The ALJ found Pryor had severe impairments of back pain and depression and her combination of impairments did not meet or equal any impairment in the Listing of Impairments in 20 C.F.R. Pt. 404, subpt. P, app. 1. Tr. 42.[2] The ALJ found Pryor's assertions regarding her limitations were not credible. Tr. 39. He determined her RFC was a light exertion level with a limit of occasional climbing of "ropes, ladders, or scaffolds." *Id.* The ALJ further found her RFC was limited to unskilled work requiring little contact with the general public. *Id.*

A vocational expert (VE) testified at the January, 2004 hearing regarding Pryor's past relevant work as a wafer process, fast food manager and in home day care provider. Tr. 121-122. The VE testified these were jobs at the medium level of exertion. *Id.* The ALJ proposed a hypothetical question to the VE, with a person of Pryor's age, education, and work experience who was limited to sitting and standing for one half hour at a time for a maximum of four hours, and had limits on lifting, climbing, stooping, crawling, bending and reaching. The VE testified the person

---

[2]In his opinion, the ALJ stated he did not believe Pryor had severe impairments, but, giving her the "benefit of the doubt," deemed she had medically determinable impairments that were severe. In his findings, the ALJ stated her impairments were severe based on the requirements in 20 C.F.R. §§ 404.1520, 416. 920.

would be unable to perform Pryor's past relevant work and identified three sedentary, unskilled jobs the person could perform. Tr. 122-123. The ALJ then proposed a hypothetical of the same individual with an RFC of a light exertion level. The VE responded the person would not be able to perform Pryor's past relevant work but could perform the same sedentary jobs. Tr. 124. Finally, the ALJ proposed a hypothetical with the physical limitations of the first hypothetical and additional moderate nonexertional limits. The VE eliminated one of the sedentary jobs. Tr. 126-127. The ALJ stipulated, for "purposes of the record and in the interest of judicial economy that if, in fact, I was to accept as true the MRFC ratings as given by Dr. Tongue on Pages 220 and 221, that person would not be able to work." Tr. 127. The ALJ found Pryor could not perform her past relevant work. Tr. 40. He found she could perform other work in the national economy and was not disabled. Tr. 42.

## DISCUSSION

The Commissioner concedes that her decision cannot be sustained, but contends that further administrative proceedings are required at step five of the sequential evaluation. She admits some error by the ALJ in evaluation of the record. Pryor opposes the Commissioner's motion to remand and asserts the record, if fully credited, is sufficient for a finding of disability and a remand for award of benefits.

### I.     Medical Evidence

Pryor was involved in a motor vehicle accident while leaving work on December 12, 1999. She was taken by ambulance to Legacy Health System emergency room with bruising on the left side of her head and her right foot. She was instructed on using crutches, caring from sprains, and precautions following a head injury. Tr. 429-30. Later that evening, Pryor went to the emergency

room at Kaiser Permanente with cervical sprain, left foot contusion, and pain in her jaw area. Tr. 339. She returned to Kaiser on December 14, 1999, for follow up to her whiplash, and complained of sagging on the left side of her face, neck and back pain, and loss of memory. Pryor was diagnosed with cervical strain and depression and given Prozac and Valium. Tr. 474. Follow up visits to Kaiser on December 19 and 23, 1999 noted lower back pain, right leg sciatica, and mood problems. Pryor had stopped taking Prozac due to insomnia and her medication was changed to Paxil. Tr. 338-339.

Pryor began treatment with Dr. Scott on December 23, 1999. She complained of sagging on the left side of her face, pain in her face, arm, neck, shoulder, and head, and a bruised foot. Pryor was crying frequently and complained of "horrible" lapses of memory. Dr. Scott noted bruises on her thigh, facial muscle twitch with use, "severe compression in dorsal spine and cranium," tender jaw, head injury with unknown loss of consciousness, muscle strain and spasms, cephalagia, foot pain with ecclymosis, and situational depression. She prescribed Zoloft, vicodin, and motrin, and suggested a neurology referral. Tr. 388-391. Over the next few months, Dr. Scott signed off on Pryor's absences from work. In March, 2000, she released Pryor for work up to fours a day, with continual change of position and no lifting of over twenty-five pounds. Tr. 492, 494-495. Dr. Scott continued to treat Pryor through 2002 and her clinical notes indicate Pryor continued to have problems with memory and concentration in addition to her physical ailments. Tr. 352-392.

Dr. Johnson performed a neuropsychological exam of Pryor on March 4, 2000. He conducted several tests, including Ammons & Ammons Quick Test, Weschler Adult Intelligence Scale III (WAIS-III), Weschler Memory Scale III (WMS-III), Peabody Individual Achievement Test, Trail Making Test, Rey Complex Figure, Rey Auditory Verbal Learning Test, House Tree

6 - FINDINGS AND RECOMMENDATION

Person Drawing, and the Personality Assessment Inventory. His diagnosis was Cognitive Disorder, Adjustment Disorder, Traumatic Brain Injury, a Global Assessment of Functioning (GAF) of 55.[3] Dr. Johnson found some deficits in attention, processing, memory and language. However, he noted the difficulty of sorting out the effect of significant amounts of stress on these areas. Dr. Johnson also noted no evidence of symptoms exaggeration or malingering, although he stated that Pryor's symptoms could be influenced by her emotional state. He suggested she might benefit from a trial of stimulant medications to determine if she could regain some efficiency in processing and acquiring information. Tr. 505-517.

Dr. Turco, a psychiatrist consultant for the accident insurer, examined Pryor on May 5, 2000. He diagnosed depressive disorder, chronic, which predated the accident. He stated Pryor could be having concentration and memory problems from her pain medications. Dr. Turco found "a tendency to express emotional difficulties with physical complaints" which would "likely prolong her convalescence and ultimate return to work." Tr. 518-523. Dr. Rischitelli, a consultant for the accident insurer also examined Pryor on May 5, 2000. Tr. 524-535. He noted Pryor "appears to have many stigmata of chronic pain syndrome", and her subjective complaints outweigh the objective findings. Dr. Rischitelli also found her depression was a pre-existing condition and not the result of the accident. He recommended extensive physical, psychological and vocational rehabilitation. Tr. 534.

---

[3]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers) The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000).

7 - FINDINGS AND RECOMMENDATION

Dr. Tongue conducted a psychological evaluation of Pryor in June 2000 upon a referral from her medical providers at Kaiser. He performed psychological testing, including the WAIS III, WMS III, Logical Memory, Controlled Oral Word Association Test, Trail Making Tests A & B, Rey Auditory Verbal Learning Test, Rey Ossterrieth Complex Figure Copy and Recall, Hooper Visual Organization Test, Category Test, Zung Depression Scale, and Beck Anxiety Inventory. Dr. Tongue found Pryor had the most difficulty on executive functioning[4] and visual memory. He also noted it was difficult to separate out other factors, such as stress and depression. Dr. Tongue diagnosed Cognitive Disorder NOS, and a GAF of 60. Tr. 331-335, 433-437. He noted she would have problems with distractions, busy or noisy work environments, and was likely to have trouble with multi-step tasks. Tr. 331.

Pryor continued to receive treatment through Kaiser for her physical complaints, memory loss, and cognitive impairment. Tr. 337-339, 449, 462. During an August, 2000, visit to Dr. Scott, Pryor complained of headaches and ongoing cognitive problems. She reported no cognitive difference when off pain medications. Tr. 369. Pryor had a minor car accident on December 18, 2000 and was treated by Dr. Scott for lumbar and sacral pain, post concussion syndrome secondary to head injury, chronic pain syndrome, right arm pain and right foot numbness, strain of the cervical and thoracic area and ribs with somatic dysfunction, depression, cephalagia, and sleep disturbance secondary to pain. Tr. 421-422. Dr. Scott prescribed MS contin and discussed the side effects of narcotic drugs with Pryor. Tr. 363, 367-368. On January 4, 2001, Dr. Scott released Pryor to a four hour work day with the need to change positions and limit walking. Tr. 492. In a letter to Pryor's

---

[4] Executive functioning refers to mental flexibility and ability to plan, organize, sequence, and abstract. The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Appendix B, 764 (4th ed. 2000).

8 - FINDINGS AND RECOMMENDATION

accident attorney on January 8, 2001, Dr. Scott stated Pryor's post-concussion syndrome prevented her from multitasking which was required in her previous job. Tr. 491.

Pryor's treatment for her lumbar disc disorder at Kaiser included a March 2001 x-ray of the Sacro-iliac joints and CT scan of her lower back. The x-ray findings were normal. The CT scan indicated disc bulges at L3-4, no nerve root impingement or stenosis and that the thecal sac was decreased twenty-five percent by the disc bulge. It was noted that Pryor's obesity prevented a better scan. Tr. 337, 343-344. An MRI of the lumbar spine on November 28, 2001, indicated a small left paracentral L5-SI disk protrusion of questionable clinical significance. Tr. 342. Pryor fell in May, 2001 and continued her pain medications. Tr. 356-358. In September, 2001, Dr. Scott recommended Pryor seek pain management care and a TENS unit for her continued pain through her physicians at Kaiser. Tr. 353-356.

The vocational assessment from the state agency found Pryor was not capable of performing her past relevant work. The RFC developed for her was light exertion level with limits on concentration and pace. It was determined that she was capable of other work such as assembler and cafeteria attendant. Tr. 257. In letters to the state agency on November, 2001, January, 2002, and April 2002, Dr. Scott stated Pryor's chronic back pain prevented her from sitting or standing for long periods. She noted agreement with the diagnosis of Dr. Tongue with the added diagnosis of depression. Dr. Scott stated Pryor's pain affected her ability to function, but the most critical issue was her head injury. She opined that Pryor could not sustain employment. Tr. 348-350, 351.

State agency consultants Drs. Henry and Latham, reviewed Pryor's psychiatric records on February 4, 2002, and confirmed diagnoses of cognitive disorder and depression, with moderate difficulties in maintaining concentration, persistence, and pace. Tr. 397-407. The state agency

developed a mental RFC for the period from December 12, 1999 through September 30, 2001, with moderate limitations on following detailed instructions. Tr. 411-413. State agency consultants Drs. Kehrli and Spray noted Pryor's diagnoses of obesity, cognitive disorder, hypothyroidism, alleged chronic pain syndrome, and memory impairment. They developed an RFC of light exertional level with only occasional climbing. Tr. 157, 415-420.

Dr. Scott completed a Physical Capacities Evaluation form for Hartford Insurance Company on April 2, 2002. She noted limitations of sitting for one-half hour at a time for four hours, walking for one-half hour at a time for two hours, standing for one-half hour at a time for four hours, with a maximum work day of four hours. Dr. Scott further noted limits of lifting ten pounds occasionally and never more than 20 pounds, with the same limits on pushing and pulling. She also added limitations of only occasionally climbing, stooping, or crawling, and never reaching below the waist. Dr. Scott commented on the form that any work must be with physical restrictions, but she did not believe Pryor's mental condition would allow work. Tr. 423-425. In a letter to Pryor's attorney on October 16, 2002, Dr. Scott reported her diagnosis of Pryor from August 26, 2002 was chronic pain syndrome, disc bulges at L3-L4, L4-L5, L5-SI with radicular symptoms, depression, cephalagia, post concussion syndrome secondary to head injury, and insomnia. She stated Pryor was not capable of regular and gainful employment. Tr. 421-422. Dr. Scott prescribe antidepressants to Pryor throughout her treatment. *Id.* Pryor received counseling from a counselor through the Church of the Latter Day Saints. Tr. 61, 520.

Pryor began treatment with Dr. McHarris at Legacy Health Care after a brief hospitalization for acute renal failure and mental confusion on August 15, 2003. The renal failure was attributed to dehydration, and Pryor left the hospital against medical advice. Tr. 569-572, 575, 576. Dr.

McHarris treated Pryor for chronic back pain, depression, closed head injury and insomnia.  Tr. 566-587.  Clinical notes from Dr. McHarris from February 13, 2004, note chronic back pain, mild cognitive impairment, obesity, depression, and hypertension.  Dr. McHarris stated Pryor could achieve employment in a few years if she received vocational rehabilitation, physical therapy, counseling and  sustained weight loss.  Dr. Harris further stated, "at this time she is not capable of regular and gainful employment."  Dr. McHarris also noted that it would be difficult for Pryor to maintain work due to "flare-ups."  Tr.  582.

In September, 2003, the state agency referred Pryor to Dr. Tongue for a neuropsychological follow up examination.  Dr. Tongue noted Pryor's executive functioning remained in the  lower 5th percentile, which was the same result as her previous testing.  He further noted she had improved in some areas since last testing but continued to have difficulty in other areas.  Dr. Tongue found Pryor continued to have problems in verbal learning and memory and her mild cognitive deficits were exaggerated by her personality structure.  He believed she exhibited some unconscious malingering due to low self-esteem and a desire for companionship.  Dr. Tongue diagnosed Cognitive Disorder NOS, Mood Disorder NOS, Mixed Personality Disorder with Features of Histrionic and Dependent personality, and a GAF 50[5].  Tr.  544-562.  Dr. Tongue completed the state agency Ability to Do Work (Mental) form.  He noted marked deficits in four areas: understanding and remembering detailed instructions; carrying out detailed instructions; responding appropriately to work pressures and work setting; and responding appropriately to changes in routine

---

[5]A GAF of 41 to 50 indicates serious symptoms (suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job).  The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000).

11 - FINDINGS AND RECOMMENDATION

in work setting. Dr. Tongue also noted moderate deficits in carrying out short, simple instructions. Tr. 562-564.

Three medical experts (ME) testified at the administrative hearings. Dr Pati, a psychiatrist, testified at the July 21, 2003 administrative hearing. He testified Pryor's depression and cognitive disorder resulted in only moderate limitations in the areas of detailed instructions and dealing with the public. Tr. 83. Dr. DeBolt, a neurologist, testified at the January 15, 2004 administrative hearing. He stated Pryor's condition did not meet or equal a listing. Dr. DeBolt testified further that Pryor's condition was not neurologically severe. Dr. DeBolt noted Pryor's psychological test results could be affected by her pain medications, which he believed were excessive. Tr. 94-103. Dr. Hart, a psychologist, also testified at that hearing. He noted the psychological testing supported a diagnosis of cognitive disorder. However, he testified that the test results could be affected by Pryor's use of pain medication or malingering, which would then be classified as a different cognitive impairment under the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV). Tr. 106-109.

## II.     Medical Source Opinions

Pryor asserts the ALJ erred in assessing the medical opinions of Drs. Scott, Johnson, Tongue, and McHarris. The Commissioner concedes the ALJ did not properly address the medical opinions of Drs. Scott and McHarris, but argues the ALJ relied on the testimony of the medical experts. Dr. Scott was Pryor's treating physician from December 12, 1999 through October, 2002. She wrote three letters to the state agency regarding Pryor's physical and mental work limitations. Dr. Scott also completed a Physical Capacities Form for the accident insurer. She stated Pryor had the physical capacity to work up to fours a day with the limitations discussed above. Dr. Scott also

stated Pryor's mental impairments prevented her from sustaining employment. The ALJ stated he accepted Dr. Scott's opinion, confirmed by the other examining physicians and psychologists, that Pryor had a pre-existing depressive condition. Tr. 32. The Commissioner admits the ALJ did not address Dr. Scott's opinion regarding Pryor's physical ability to work only four hours a day with other limitations.

Dr. McHarris began treating Pryor in August of 2003. Dr. McHarris' clinical notes from February 2004 state Pryor was unable to work at that time. The Commissioner concedes the ALJ failed to discuss Dr. McHarris' opinion. The ALJ stated he gave great weight to the opinion of the ME, Dr. DeBolt. *Id.* Dr. Scott and Dr. McHarris were treating physicians and Dr. DeBolt was a nonexamining physician. Social security regulations specify that the most weight is given to the opinions of treating physicians, followed by examining physicians, and the least amount of weight is given to nonexamining experts. *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001). In order to rely on the testimony of Dr. DeBolt, the ALJ must give specific and legitimate reasons based on substantial evidence in the record for discounting the opinions of Drs. Scott and McHarris. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998); *Embrey v. Bowen,* 849 F.3d 408, 421 (9th Cir. 1988). The ALJ failed to do so.

Dr. Tongue was an examining psychologist who conducted neuropsychological testing of Pryor in June 2000 on referral from her providers at Kaiser. The state agency contacted Dr. Tongue in September 2003 to conduct follow up neuropsychological testing and complete an MRFC form. Dr. Tongue noted four areas of marked deficits on the MRFC form. The ALJ stipulated during the administrative hearing that if he accepted Dr. Tongue's opinion he would be required to find Pryor disabled. The ALJ rejected Dr. Tongue's opinion, stating:

13 - FINDINGS AND RECOMMENDATION

> First, he relies on the claimant's self-report of a "closed head injury," which she has never had. Second, he pays no attention to the extensive opioid/narcotic and benzodiazepine medication regimen she is on. Third, he ignores the claimants intellectual score...Fourth, he relies on her reported hospitalization on August 22nd and 23rd, of 2003 for "kidney problems", as a major stressor. . . I also note that the report by Dr. Tongue is internally inconsistent as well. He diagnosis (sic) Cognitive Disorder, Not Otherwise Specified, Mood Disorder, Not Otherwise Specified, and Mixed Personality Disorder with features of both histrionic and dependent personality, with a Global Assessment of Functioning (GAF) score of 50. However, he describes symptoms and self-reports that are far more consistent with the diagnosis of Chronic Pain Syndrome, as give by Dr. Rischitelli. Further, he contradicts his own findings, in specifically noting: "Overall, findings from the TOMM (Test of Memory Malingering) would suggest that Ms. Pryor is attempting to portray herself as more cognitively impaired than would be expected from her history of head injury (as in closed head injury/concussion, which she never had) and any interpretation of findings on tests of memory function listed below must be examined in the context of the TOMM findings above." Dr. Tongue then tries to say she is unconsciously exaggerating, which is not a medically acceptable opinion, in comparison to the substantial medical evidence of record...

Tr. 34. Dr. Tongue's opinion is not directly contradicted by another examining psychologist. Dr. Johnson's opinion is consistent with Dr. Tongue's opinion and also rejected by the ALJ. Dr. Turco was an examining psychiatrist for the insurer in Pryor's accident claim and did not perform psychological testing. Dr. Turco found a pre-existing chronic problem of depression and noted Pryor's concentration and memory problems could be from her medications. Dr. Turco does not contradict the existence of the concentration and memory problems. Tr. 518-523. Dr. Hart, the psychologist ME, specifically testified the testing data supported the diagnosis of a cognitive disorder, whether caused by a head injury or medications. Tr. 106-109. The state agency consultants did not reevaluate Pryor's mental RFC after Dr. Tongue's 2003 evaluation, and Dr. Tongue was acting in the capacity of an examiner for the state agency in 2003.

Even if Dr. Tongue's opinion were controverted by another psychologist, the ALJ must give specific and legitimate reasons based on substantial evidence in the record for rejecting it. *Andrews*

14 - FINDINGS AND RECOMMENDATION

*v. Shalala,* 53 F. 3d 1035, 1043 (9th Cir. 1995). The Commissioner concedes the ALJ's opinion that Pryor did not suffer from a head injury was not based on substantial evidence in the record. The ALJ's other reasons for rejecting Dr. Tongue's opinion are also not based on substantial evidence in the record. Dr. Tongue notes Pryor's use of pain medications, including MS Contin, in his report Tr. 545. Average IQ scores and cognitive impairments are not mutually exclusive. A cognitive impairment can be in a very localized part of overall functioning, such as memory and concentration.[6] Contrary to the opinion of the ALJ, Dr. Tongue simply lists Pryor's hospitalization for kidney failure under the report paragraph "Other Medical History" and under Axis III for general medical conditions. Although Pryor checked out of the hospital against medical advice, she was admitted for acute kidney failure and mental confusion. Dr. Tongue's report is not internally inconsistent, and his diagnosis of a personality disorder is not outside of his area of expertise. Dr. Tongue's report summary states:

> I have now seen her on two different occasions for neuropsychological examination with some variance in the results of testing, involving improvement in some areas and continued difficulty in others. She has consistently displayed a diminished ability in terms of executive functioning, i.e., mental flexibility and shifting of cognitive set, as well as a narrowed attention span. Overall, she displays an average range intellectual capacity, but has consistently displayed additional disturbance in verbal learning and memory. A test of memory malingering is consistent with the profile of a patient who is exaggerating her cognitive deficits. I believe the profile of this patient's functioning consists of a combination of mild cognitive deficits, which are genuine, and which are also exaggerated and emphasized in a manner that is unconsciously driven by the patient's personality structure. Personality factors play a strong role in this patient's experience of her neurocognitive symptoms in that these are exacerbated and exaggerated by her sense of incompetence and a lack of capacity for independent functioning, which are the dominating features of her self-concept. With regard to disability criteria, I suspect that Ms. Pryor's constellation of symptoms preclude her functioning at a job. Psychological factors of personality

---

[6] *See,* The American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders,</u> 762 (4th ed. 2000).

15 - FINDINGS AND RECOMMENDATION

>structure and underlying depression along with those cognitive deficits she does have would likely cause her considerable difficulty adapting to changes in a workplace environment and maintaining the concentration, persistence and pace necessary for employment.

Tr. 549-550.

The only other neuropsychological testing of Pryor was conducted by Dr. Johnson. Dr. Johnson's opinion was also rejected by the ALJ because of Pryor's "self-report of head injury," her IQ testing, and medication regimen. The ALJ's rejection of this opinion is also not based on substantial evidence. As noted above, the Commissioner concedes the medical evidence substantiates Pryor's head injury, and IQ scores do not negate cognitive impairment. Dr. Johnson also describes Pryor's medication use in his report. Tr. 506. Dr. Johnson's report is consistent with Dr. Tongue's report. Dr Johnson diagnosed Pryor with a Cognitive Disorder and Adjustment Disorder with mixed emotional features. He found Pryor had difficulty with attention, concentration and executive functioning, exacerbated by her emotional distress. Tr. 508-511. Dr. Johnson's report supports the findings of Dr. Tongue.

The ALJ stipulated at the hearing that Dr. Tongue's opinion would require a finding of disability. The Commissioner acknowledged the ALJ erred in not addressing the disability opinions of Drs. Scott and McHarris. The Commissioner also acknowledges that the ALJ did not adequately discuss the opinions of the examining physicians, Drs. Turco and Rischitelli, that "plaintiff would have a difficult time returning to work." (def. br. p. 15). It is clear from the record that the treating and examining physicians and psychologists disagreed regarding the causation and treatment of Pryor's impairments. It is also clear they agree Pryor is unable to work, or unable to work without

rehabilitation and a change in treatment.[7] The Commissioner argues the ALJ relied on the testimony of the medical experts and failed to adequately state his conclusions regarding the relevant medical evidence. However, the ALJ not only failed to adequately address the opinions of the treating and examining physicians, but made diagnoses of his own, specifically Somatoform Disorder and Prescription Drug Dependence. Tr. 35. The Commissioner acknowledges there is no diagnosis in the record for either disorder. The ALJ cannot make medical diagnoses or substitute his opinion for the opinion of treating and examining physicians that are based on substantial evidence in the record. *See,* Social Security Ruling 96-2p. The ALJ has erred in improperly rejecting the opinions of Drs. Scott, McHarris, Tongue and Johnson.

### III.   Step Five Determination

The Commissioner concedes that when Pryor turned fifty years old in September 2003, she would be presumptively disabled under the Medical-Vocational Guidelines if limited to sedentary unskilled work. 20 C.F.R. pt. 404, subpt. P, app. 2, Rule 201.12. The ALJ specified in Pryor's RFC she was limited to unskilled work. The VE testified there were jobs at the sedentary level of exertion Pryor could perform but failed to identify any jobs at the light level of exertion. The Commissioner asserts the VE's answer to the ALJ's hypothetical was incomplete and the case should be remanded for supplemental vocational testimony. Pryor asserts the Commissioner has failed to meet her burden at step five of demonstrating there are jobs in the national economy at the light level

---

[7]For example, Dr. Rischitelli, the insurance carrier consultant, recommended physical and vocational rehabilitation, and psychological therapy. However, he did not believe the accident was the cause of her impairment. Tr. 534. Dr. McHarris recommended physical and vocational rehabilitation.

17 - FINDINGS AND RECOMMENDATION

of exertion that Pryor can perform. However, the court need not reach this issue due to the ALJ's errors in determining Pryor's RFC.

## IV.    Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000), *cert. denied*, 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen,* 876 F2d 759, 763 (9th Cir 1989).

Improperly rejected evidence should be credited and an immediate award of benefits directed where

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Harman*, 211 F.3d at 1178, citing *Smolen* v. *Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). Of course, the third prong of this test is actually a subpart of the second. *Id.* at 1178 n 7.

There have been four hearings in this case. There is extensive medical evidence regarding Pryor's disability that was improperly rejected by the ALJ. The ALJ stipulated the opinion of Dr. Tongue alone would required a finding of disability. Dr. Tongue's opinion is supported by the improperly rejected evidence of the treating and examining physicians and by the record as a whole. There are no outstanding issues for a determination of disability. Crediting the improperly rejected

evidence requires a finding of disability, which is supported by substantial evidence in the record.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

19 - FINDINGS AND RECOMMENDATION

## CONCLUSION

Based on the foregoing findings and conclusions, the Commissioner's final decision should be reversed and remanded for an award of benefits. A final judgment should be entered pursuant to sentence four of 42 U.S.C. § 405(g).

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due November 14, 2006. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

DATED this 27th day of October, 2006.

      /s/ Paul Papak
Paul J. Papak
United States Magistrate Judge